**Jason D. FINLEY, Appellant**

**v.**

**The STATE of Texas, Appellee**

**NO. 14-16-00411-CR**

Court of Appeals of Texas, Houston (14th Dist.).

Opinion filed August 15, 2017

Discretionary Review Refused October 18, 2017

Jerald Kaplan Graber, Houston, TX, for Appellant.

Melissa H. Stryker, Houston, TX, for Appellee.

Panel consists of Justices Christopher, Busby, and Jewell.

## OPINION

Kevin Jewell, Justice

Appellant Jason Finley appeals from his conviction for murder. In two issues, he argues that he is entitled to acquittal because there is legally insufficient evidence that he committed the murder, or alternatively, that he is entitled to a new trial based on a racially motivated strike of a prospective juror during jury selection.

We affirm.

### Background

On a Tuesday afternoon in April 2013, two teenage girls came home from school and found their mother, Darlishia Watson, lying dead on the living room floor. She had been stabbed 82 times.

When police arrived and searched the home, they discovered that Watson's cell phone and keys were missing, as was the trash bag from the kitchen trash can. Police believed Watson was murdered sometime between 2:42 p.m., when she last sent a text message from her cell phone, and roughly 3:00 p.m., when her two eldest daughters arrived home from school. One

of Watson's daughters told an officer, "[I]t was Jason."

Appellant and Watson had been in a dating relationship for roughly eight months. Witnesses placed appellant at or near Watson's house on the afternoon Watson was murdered. He left around 3:00 p.m. and is seen on a neighbor's surveillance camera walking away from Watson's house holding a white or clear trash bag. The neighbor, Craig, who was home that day, thought it was "suspicious" that someone was carrying a bag of trash down the street on trash day and the trash had not yet been collected: "why not just put the trash on the curb." Craig "g[o]t a good look" at the man walking down the street and identified him as appellant; Craig also identified appellant from a photo array.

A twelve-year-old boy who lived in the neighborhood, Jonathan, was outside his house playing basketball around 3:00 p.m. that afternoon. Jonathan said he saw a man carrying a plastic bag walk "fairly quickly" down the street. Jonathan thought "it was kind of weird, you know. One, it was trash day and two, I'm not really sure why you would take a trash bag to a Texaco."

While riding the school bus home, Watson's oldest daughter saw appellant walking down the street carrying a trash bag.

Deputy Clayton, the investigator who processed the crime scene, noted the presence of bloodstains in the living room, where Watson was murdered, and in the kitchen. Blood stained the area around the kitchen sink, indicating that someone had tried to wash their hands or clean up after the murder. Bloodstains were present on the side of the kitchen trash can, which did not have a trash bag in it. Deputy Clayton sprayed the floor with a chemical designed to enhance any hard-to-see bloodstains.

The sprayed floor revealed partial footprints going in both directions between the living room and the kitchen. There were bloody footprints on the floor around the sink and around the trash can, as well as a partial footprint on the trash can's foot pedal, which could be depressed to lever the lid open.

Deputy Clayton believed that, based on the blood spatter, the suspect was likely wounded and bleeding. As he explained, when a knife is used to stab a victim repeatedly blood is likely to spread from the blade up the handle, making the handle slippery. If the knife lacks a guard to stop the assailant's hand from sliding, the assailant's hand often will be cut when it slides down the blade.

Police suspected appellant may have been responsible for Watson's death. Appellant was living in a hotel at the time. Police officers went to the hotel the night of Watson's murder to talk with him, and appellant consented to a search of his room. The officers seized three knives from appellant's room, though police were ultimately unable to connect any of the knives to Watson's death. Appellant also agreed to go to the police station to give an interview. During the officers' interactions with appellant, they observed that appellant had a "pretty substantial cut or gash" on the palm side of his right-hand pinkie finger, consistent with Deputy Clayton's expectations regarding potential injury to the assailant's hand.

Police also asked for appellant's consent to obtain a DNA sample, which appellant provided. Forensic testing revealed that DNA obtained from two blood swabs on the floor could not exclude appellant as a possible source of the DNA (and thus the blood).[1] Harris County's forensic analyst

---

1. The analyst explained that she can only say whether a person is excluded as a contributor

testified that the chance of finding another African-American with the same DNA profile as appellant's in the crime-scene blood is 1 in 161 quintillion.[2] The DNA analyst testified that "[y]ou would have to search [23 billion] earth[s] with the same population to find the same DNA profile again." DNA obtained from the bloodstains at the sink was consistent with a mixture of DNA from two or more individuals; Watson and appellant could not be excluded as possible contributors to that mixture.[3]

Appellant was charged with Watson's murder. He pleaded not guilty and the case proceeded to a jury trial. The jury found appellant guilty as charged in the indictment, and the trial court sentenced appellant to life in prison. This appeal timely followed.

### Analysis

#### A. Sufficiency of the Evidence

In his second issue, appellant argues that there is insufficient evidence that he committed the murder for which he was convicted. We address this issue first because it seeks the greatest relief. *See Campbell v. State*, 125 S.W.3d 1, 4 n.1 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (reviewing court will first address issues that, if sustained, require reversal and rendition of judgment, before turning to issues seeking remand).

1. *Standard of review and governing law*

We apply a legal-sufficiency standard of review in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). Under this standard, we examine all the evidence adduced at trial in the light most favorable to the verdict to determine whether a jury was rationally justified in finding guilt beyond a reasonable doubt. *Temple*, 390 S.W.3d at 360; *Criff v. State*, 438 S.W.3d 134, 136-37 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). This standard applies to both direct and circumstantial evidence. *Criff*, 438 S.W.3d at 137. Accordingly, we will uphold the jury's verdict unless a rational factfinder must have had a reasonable doubt as to any essential element. *Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009); *West v. State*, 406 S.W.3d 748, 756 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

Appellant was charged with, and convicted of, murder. A person commits murder if, as relevant here, he: (1) intentionally or knowingly causes the death of an individual; or (2) intends to cause serious bodily injury and commits an act clear-

---

to a DNA sample, not that a person is a match, because to conclusively determine that a person matches a DNA sample an analyst would have to test every person in the world. The common practice, according to the witness, is to say that the person cannot be excluded and then provide the statistical probability of finding the same DNA profile in the general population.

2. Appellant is African-American. The DNA profile obtained from the floor swabs is expected to occur even less frequently in Caucasian or Hispanic populations—approximately

1 in 44.06 sextillion and 1 in 203.5 sextillion, respectively.

3. DNA results obtained from a water bottle found near Watson's body were consistent with a mixture of DNA from two or more individuals; Watson and appellant could not be excluded as possible contributors to the mixture. On cross-examination, the forensic analyst admitted that she could not tell whether appellant's DNA on the bottle came from his blood or some other source, like skin cells or saliva.

ly dangerous to human life that causes the death of an individual. Tex. Penal Code § 19.02(b)(1), (2). To obtain a conviction, the State must prove, *inter alia*, that the defendant is the person who committed the charged offense. *Johnson v. State*, 673 S.W.2d 190, 196 (Tex. Crim. App. 1984); *Kromah v. State*, 283 S.W.3d 47, 50 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd).

### 2. *Application*

■ Appellant argues that "no reasonable jury properly could have found that appellant committed the murder of the complainant. The State did not present any evidence from a witness who actually saw who killed Ms. Watson, or any evidence that proved that that appellant was the individual who entered and exited Ms. Watson's home around the time of the killing, or any evidence that appellant admitted to stabbing Ms. Watson." This argument is erroneously premised on the idea that the State can meet its burden by presenting only direct evidence of a crime. Yet, circumstantial evidence "is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see also Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986) (identity may be proved by direct or circumstantial evidence); *Caldwell v. State*, No. 14-08-01019-CR, 2010 WL 1655471, at *6 (Tex. App.—Houston [14th Dist.] Apr. 27, 2010, pet. ref'd) (mem. op., not designated for publication) (same).

Perhaps recognizing this point, appellant further contends that the DNA evidence "does not prove that appellant was the actual person who stabbed Ms. Watson, only that he had been in [Watson's] home at some point previously." In order to address appellant's argument, we turn to whether the DNA evidence, along with the

other evidence adduced at trial, supports the jury's finding of guilt. *See Caldwell*, 2010 WL 1655471, at *6 ("DNA evidence coupled with reasonable inferences drawn from circumstantial evidence will support a conviction."); *see also Allen v. State*, Nos. 05-11-00056-CR, 05-11-00057-CR, 2012 WL 2106530, at *2 (Tex. App.—Dallas June 12, 2012, pet. ref'd) (not designated for publication) (State can prove identity through circumstantial evidence, including DNA).

For purposes of appellant's issue, the ultimate fact to be proved was the identity of Watson's killer. *See Clayton v. State*, 235 S.W.3d 772, 779 (Tex. Crim. App. 2007). The forensic analyst testified that blood swabbed from the floor was exceptionally likely to have come from appellant. But appellant's blood at the scene does not constitute direct evidence of the ultimate fact to be proved—that appellant stabbed Watson. *Id.* The blood establishes only that appellant was at the crime scene at some point. *Id.* Therefore, the blood, standing alone, does not sufficiently establish that appellant stabbed Watson. *Id.* However, the presence of appellant's blood, and its location throughout the crime scene, constitutes circumstantial evidence to be considered with the remaining circumstantial evidence admitted at appellant's trial. *See id.*

Separately from establishing appellant's presence at the crime scene, the blood provides an additional, incremental piece of circumstantial evidence that supports an inference that appellant was the person who stabbed Watson to death. *See id.* Deputy Clayton testified that a bloody knife will sometimes slip in an assailant's hand, cutting him or her. Appellant had a fresh cut on his right-hand pinkie finger on the day of, and following, the murder. In considering this evidence, a rational juror could infer that appellant's cut was the source of blood found at the scene, and

thus, that appellant was the person who had wielded the knife used to stab Watson. *See, e.g., Easley v. State*, 986 S.W.2d 264, 271 (Tex. App.—San Antonio 1998, no pet.) (witness testified that appellant's wounds on hand could have resulted when his hand slipped from a knife handle; accordingly, jury could infer that appellant cut his hand while stabbing victim).

Moreover, blood containing a mixture of appellant's DNA and Watson's DNA was found within and nearby the sink. While the presence of appellant's blood, alone, is evidence only that he was at the house at some point, the mixture of appellant's blood and Watson's blood in the sink is evidence that appellant was at the scene *after* Watson had been stabbed and that he was close enough to her that her blood transferred to his person. *See Branham v. State*, No. 14-15-00329-CR, 2016 WL 4480575, at *3 (Tex. App.—Houston [14th Dist.] Aug. 25, 2016, no pet.) (mem. op., not designated for publication) (DNA evidence of appellant's blood mixed with victim's blood linked appellant to victim's injuries). Jurors could also rationally infer from this evidence that appellant was attempting to eliminate evidence by cleaning up or rinsing blood from his hands.

The State also presented evidence—both through testifying witnesses and surveillance video—that appellant quickly left Watson's house carrying a trash bag. Blood was found on the kitchen trash can, and the trash can was missing its liner when police arrived at Watson's house. Jurors could rationally infer that, in order to dispose of evidence, appellant bagged evidence of the crime, such as bloody clothes or the murder weapon, and left the scene carrying the bag. *Accord Clayton*, 235 S.W.3d at 779 (jurors could rationally infer that, in order to dispose of the evi-

dence, appellant drove victim to a park after shooting the victim in a different location).

■ A factfinder may draw an inference of guilt from the circumstance of flight. *See id.* at 780. There is no question that appellant left Watson's house some time around 3:00 p.m. on the afternoon of April 2.[4] The State introduced evidence that Watson was killed between 2:42 p.m. and 3:00 p.m. While appellant's failure to inform authorities about Watson is not enough to establish guilt, appellant's flight from the house—specifically, from the scene of Watson's murder—nevertheless constitutes an additional piece of incriminating circumstantial evidence. *Id.* And, given the evidence indicating that no one other than appellant was with Watson in the locked home during the final minutes of her life, it is rational to infer that appellant—and only appellant—was with Watson when she was stabbed. *Id.* at 782; *accord also Dawkins v. State*, 495 S.W.3d 890, 896 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (substantial circumstantial evidence was presented from which a rational jury could have found that the appellant murdered victim, where it was undisputed that the appellant was in a dating relationship with victim, evidence showed that victim was murdered by someone she knew intimately, and door showed no signs of forced entry).

After reviewing the evidence under the *Jackson* standard, we hold that the combined and cumulative force of the evidence is legally sufficient to support the jury's guilty verdict. *Clayton*, 235 S.W.3d at 778, 782 ("combined and cumulative force of the [circumstantial] evidence," viewed in the

---

4.  Indeed, defense counsel stated in her opening argument to the jury that "there is no debate that that is, in fact, Jason Finley walking out of Darlishia Watson's house."

light most favorable to the jury's verdict, was legally sufficient).

We overrule appellant's second issue.

## B. *Batson* Challenge

In his remaining issue, appellant argues that the trial court erred by denying his *Batson* challenge after the State used a peremptory strike to dismiss from the jury panel a prospective juror whom appellant asserts is a member of the same racial minority as appellant, African-American. Appellant argues that the State's strike was on account of the potential juror's membership in a cognizable racial minority.

### 1. *Standard of review and governing law*

■ In *Batson v. Kentucky*, the Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution forbids the State from exercising its peremptory strikes based solely on the race of a potential juror. *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *see also Nieto v. State*, 365 S.W.3d 673, 675 (Tex. Crim. App. 2012); *Jones v. State*, 431 S.W.3d 149, 154 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd); U.S. Const. amend. XIV, § 1. Even a single impermissible strike for a racially motivated reason invalidates the jury-selection process and requires a new trial. *Snyder v. Louisiana*, 552 U.S. 472, 478, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008); *Jones*, 431 S.W.3d at 154.

■ A *Batson* challenge consists of three steps. *Nieto*, 365 S.W.3d at 675; *Ebong v. State*, No. 14-14-00070-CR, 2015 WL 1632713, at *3 (Tex. App.—Houston [14th Dist.] Apr. 9, 2015, pet. dism'd) (mem. op., not designated for publication). First, the defendant must make a prima facie showing of racial discrimination in the State's use of a peremptory strike. *Nieto*, 365 S.W.3d at 675. If the defendant makes the requisite showing, the burden shifts to the State to articulate a race-neutral explanation for its strike. *Id.* The race-neutral explanation is a burden of production only and does not have to be "persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 767-68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). Rather, " 'the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' " *Id.* (quoting *Hernandez v. New York*, 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion)). Third, in evaluating the genuineness of the prosecutor's explanation, the trial court must determine if the defendant has proved purposeful discrimination by a preponderance of the evidence. *Blackman v. State*, 414 S.W.3d 757, 764-65 (Tex. Crim. App. 2013); *Nieto*, 365 S.W.3d at 675. The burden of persuasion remains on the defendant at all times. *See Jasper v. State*, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001).

■ We review a trial court's ruling on a *Batson* challenge for clear error, focusing on the genuineness of the asserted non-racial motive for the strike, rather than the reasonableness. *Nieto*, 365 S.W.3d at 676; *see also Blackman*, 414 S.W.3d at 765; *Battles v. State*, No. 14-15-00775-CR, 2017 WL 89401, at *6 (Tex. App.—Houston [14th Dist.] Jan. 10, 2017, pet. ref'd) (mem. op., not designated for publication) ("The trial court's ruling must be sustained unless it is clearly erroneous."). We consider the entire voir dire record in assessing the trial court's determination, and we are not limited to arguments or considerations that the parties specifically called to the trial court's attention so long as those arguments or considerations are manifestly grounded in the appellate record. *Ebong*,

2015 WL 1632713, at *4 (citing *Watkins v. State*, 245 S.W.3d 444, 448 (Tex. Crim. App. 2008)). We afford great deference to the trial court's ruling on the issue of discriminatory intent because a finding regarding intentional discrimination largely turns on the trial court's evaluation of the demeanor and credibility of the attorney who exercised the peremptory challenge. *Id.* (citing *Hernandez*, 500 U.S. at 364-65, 111 S.Ct. 1859; *Alexander v. State*, 866 S.W.2d 1, 8 (Tex. Crim. App. 1993)). Additionally, race-neutral reasons for peremptory challenges often invoke a juror's demeanor, making the trial court's firsthand observations of even greater importance. *Snyder*, 552 U.S. at 477, 128 S.Ct. 1203. We will not disturb the trial court's ruling unless we are left with a definite and firm conviction that a mistake has been committed. *Hernandez*, 500 U.S. at 369, 111 S.Ct. 1859; *see also Battles*, 2017 WL 89401, at * 6 ("We defer to the trial court's ruling in the absence of exceptional circumstances.").

### 2. *Application*

#### a. Appellant's prima facie showing is moot

At the conclusion of voir dire, defense counsel raised a *Batson* challenge to the State's peremptory strikes of two venire members. On appeal, appellant challenges only the strike of venire member four.

It is unclear whether appellant established a prima facie case of racial discrimination. The record does not indicate whether venire member four was a member of a cognizable minority, or whether the State used peremptory strikes only on minority venire members. Nonetheless, we need not determine whether appellant made a prima facie case of racial discrimination because the State offered a race-neutral explanation for its strike of venire

member four, thereby mooting the issue of appellant's prima facie case. *See Simpson v. State*, 119 S.W.3d 262, 268 (Tex. Crim. App. 2003) ("If, as here, the State offers a race-neutral explanation before any inquiry on the prima facie case, the issue of a prima facie case is moot.").

#### b. The State provided a facially race-neutral explanation

When asked to present any "race neutral reasons for striking number[ ] four," the prosecutor responded that he believed venire member four stated that she would hold the State to "a 100% burden," rather than the required, and lesser, burden of beyond a reasonable doubt. This is a race-neutral explanation. *See Harris v. State*, No. AP-76810, 2014 WL 2155395, at *9 (Tex. Crim. App. May 21, 2014) (not designated for publication) ("[A] prosecutor's explanation that a juror would hold the State to a burden of proof higher than beyond a reasonable doubt is race-neutral.") (citing *Watkins*, 245 S.W.3d at 450-51). This satisfies the State's burden of production. *Watkins*, 245 S.W.3d at 451.

#### c. The record does not show that the prosecutor's explanation was pretext for purposeful discrimination

The burden then shifted back to appellant to prove the State's proffered explanation was pretext for purposeful discrimination. *Blackman*, 414 S.W.3d at 764. At this step, "[t]he trial court has a pivotal role in evaluating *Batson* claims," because the trial court must evaluate the prosecutor's credibility and "the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge." *Snyder*, 552 U.S. at 477, 128 S.Ct. 1203 (internal quotation omitted); *see also Blackman v. State*, 394 S.W.3d 264, 271 (Tex. App.—Houston [1st Dist.] 2012) (Keyes, J., dissenting), *rev'd, Blackman*,

414 S.W.3d at 771. "An appellate court misapplies the 'clearly erroneous' standard of appellate review when it substitutes its judgment for that of the trial court in deciding that the prosecutor's facially race-neutral explanation for striking a venire member was a pretext." *Blackman*, 394 S.W.3d at 272 (Keyes, J., dissenting) (citing *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004)).

After the State offered its explanation, appellant challenged the accuracy of the prosecutor's statements regarding some of the responses given by venire member four, saying he had "no notes on any of three of us saying 100% of anything." Appellant did not present any evidence to disprove or impeach the prosecutor's statements or seek to cross-examine the prosecutor regarding his explanations. *See, e.g., Whitsey v. State*, 796 S.W.2d 707, 723 (Tex. Crim. App. 1989) (op. on reh'g). The trial court then denied the *Batson* challenge.

On appeal, appellant argues that the State's race-neutral explanation was pretextual because it is contradicted by the record. Specifically, appellant contends that venire member four "never, ever indicated in her answers during voir dire that she would hold the State to a burden of proof of 100%." As discussed further below, appellant does not present an analysis comparing the State's strikes between minority and non-minority venire members, and the appellate record does not contain any evidence establishing each venire members' race.[5]

We turn to the voir dire record to assess whether the trial court's ruling was clearly erroneous. *See Nieto*, 365 S.W.3d at 676; *Ebong*, 2015 WL 1632713, at *4. In relevant part, the reporter's record of the voir dire provides:

[Prosecutor]: Judge talked to y'all. This is a murder case. There's one thing I talk about every time, no matter what I'm trying. It's—I talk about the burden of proof. It's beyond a reasonable doubt. What is it? What is beyond a reasonable doubt? Well, there's no definition for it, but I can tell you what it's not. It's the—first of all, it's the same burden as a speeding ticket. Okay. It's not beyond all doubt or a shadow of a doubt. You don't throw away your common sense at the courthouse door, right? You use your common sense. You use it every day. You come to a determination about beyond a reasonable doubt, using your common sense.

The question I always have is, if I prove my case to you beyond a reasonable doubt and you believe it, can you convict in this murder case, or would you still require more than beyond a reasonable doubt? And if you feel that way, it's fine. It just means this isn't the right case for you. That's what it means. And I use this, and I go through this one by one because this is so important.

Several years ago I tried a case where a gentleman was shot in the head by another individual. We were trying that case, and I talked to the jury afterwards. They voted not guilty. I said, I respect your verdict, not a problem, but I talked to the foreman. And I looked at the foreman and I said but what could I have done better in order to get y'all to vote guilty? What was I missing? What did you need? And he told me, well, you didn't prove your case 100%.

---

5. Parties often attempt to prove pretext by offering a comparative analysis of venire members of a particular race who were struck with members of other races who were not struck. *See, e.g., Miller-El v. Dretke*, 545 U.S. 231, 232, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). Appellant did not assert a comparative analysis argument in the trial court and does not raise a comparative analysis argument to this court.

Well, Juror No. 4, what burden was he holding me to?

[Venire Person]: Beyond all doubt, I guess.

[Prosecutor]: You guess? Was he holding me to beyond all doubt?

[Venire Person]: No. He was holding you to 100%.

\* \* \*

[Prosecutor]: My question is, are you going to hold me to beyond a reasonable doubt, or are you going to hold me to beyond all doubt? If it's beyond all doubt, that's fine. It just means this isn't the right case for you. It's a murder case. It's serious. I'm going to go one by one.

Juror No. 1, are you going to hold me to beyond a reasonable doubt or all doubt?

[Venire Person]: Beyond a reasonable doubt.

[Prosecutor]: Reasonable. Juror No. 3.

[Venire Person]: Reasonable.

[Prosecutor]: Juror No. 4.

[Venire Person]: Reasonable.

[Prosecutor]: You kind of shrugged your shoulders. If you feel that way, you got to tell me now and not when you're sitting in one of the comfortable seats because if it's 11 to 1, I know y'all laugh, but those are more comfortable than those. If you're hesitating, it's fine. It just means it's not the case for you.

[Venire Person]: I have—

(Reporter interrupts)

[Prosecutor]: You're going to have to speak up. She's taking down everything that we say. Okay? So, beyond a reasonable doubt?

[Venire Person]: Beyond a reasonable doubt.

\* \* \*

(Conference at the bench, on the record)

[Defense Counsel]: Juror No. 28, Your Honor, appears to be a State's strike, and I'm going to make a Batson challenge on Juror No. 28 and Juror No. 4.

[Trial Court]: For the record, the defense is making a challenge as to Batson for State's No. 4 and 28. All right. I would assume the State is ready to present their race neutral reasons for striking numbers four and 28 at this time.

[Prosecutor]: Juror No. 4's response to [co-counsel's] question about beyond a reasonable doubt, she said 100% in response to [co-counsel's] question. We didn't feel comfortable with being held to a 100% burden. He asked her several times, and she kept responding 100%.

\* \* \*

[Defense Counsel]: ... My notes on Juror No. 4, I have no notes on any of three of us saying 100% of anything, Your Honor. So, I would—so, I would refute the State's proffer with respect to those two.

[Prosecutor]: We can go back and look at the record.

[Trial Court]: I remember it. I remember it. Your motion is denied.

After reviewing the voir dire record, we agree with appellant that the prosecutor's ground for striking venire member four was contradicted by the record. The prosecutor said that venire member four "said 100%" in response to a question about the burden of proof. However, the record reflects that venire member four was describing her interpretation of a venire member's response to a question about the burden of proof raised by the prosecutor in a prior case. Venire member four did not say that she would hold the State to a "100% burden" of proof, although other venire members did assert that they would hold the State to a "beyond all doubt" standard. The issue for this court to decide

is whether this error, without more, is a sufficient basis from which we may conclude that the trial court's ruling on the *Batson* challenge was clearly erroneous.

According to appellant, a factual inaccuracy underlying the State's explanation is alone enough to meet his burden of persuasion that the explanation was pretext for purposeful discrimination. The Court of Criminal Appeals, however, has held the contrary. In *Ford v. State*, for example, the court rejected the premise that a factually incorrect, but racially neutral, explanation for a peremptory strike could by itself satisfy the defendant's burden on a *Batson* challenge. *See Ford v. State*, 1 S.W.3d 691, 693 (Tex. Crim. App. 1999). In *Ford*, the "only reason given by the State to explain its striking of [a] venire member . . . was erroneous." *Id.* at 693 (State struck venire member Allen because she knew appellant's mother, but it was venire member Alaniz who actually knew appellant's mother). But this error, the court held, was insufficient to satisfy the appellant's burden of persuasion that the prosecution's stated reasons were pretext for purposeful discrimination. *Id.* at 693-94. If all an appellant proves on appeal is that the State's reason for a challenged strike was incorrect, "this is not equal to proving that the reason given was a pretext for a racially motivated strike." *Id.*

Similarly, in *Watkins*, the prosecutor attributed a statement to a prospective juror that was unsupported by the record. *Watkins*, 245 S.W.3d at 450 (prosecutor said juror stated she would have trouble being able to give a life sentence and would need "overwhelming facts" to do so; record reflected an unidentified juror stated she would need "the right facts" before assessing life sentence). The court concluded that the prosecutor's explanation for striking the juror was "manifestly race-neutral," even if the prosecutor was "mistaken or

exaggerating about what [the venire member] told him during voir dire." *Id.* at 450, 457; *see also id.* at 457 (holding appellant failed to meet burden of persuasion that State's explanation was incredible or disingenuous, after engaging in comparative analysis of other venire members).

Also, in *Blackman*, a prosecutor offered a demeanor-based explanation for why he struck a prospective juror, but he based his challenge on mistaken recollections of the juror's answers. *See Blackman*, 414 S.W.3d at 761, 768-70. The prosecutor struck the juror because she did not have the same "vibe" he did, and he indicated that he was troubled by the juror's past jury service, in which the jury failed to reach a verdict and failed to assess punishment. *Id.* In fact, the juror had answered that the jury of her prior service *had* reached a verdict. *Id.* at 760. The Court of Criminal Appeals affirmed the trial court's finding that the prosecutor's race-neutral explanation was genuine, even if that explanation was premised on a mistaken assumption. *Id.* at 770-71. The court reasoned that "as long as [the prosecutor's] mistake was an honest one, it does not impugn the racially neutral character of his explanation." *Id.* at 770 (citing *Ford*, 1 S.W.3d at 694); *see also Harris v. State*, 996 S.W.2d 232, 235 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (holding that appellant failed to meet *Batson* burden, even though prosecutor "may have been mistaken about the . . . basis for his challenge," because the challenge was race neutral and there was "no indicia that the challenge was racially motivated").

Based on this binding precedent, we conclude that merely identifying a factual mistake in the State's race-neutral explanation for its peremptory strike is not sufficient to meet the appellant's burden of proving purposeful discrimination. Although the record supports appellant's ar-

gument that the State's reason for striking venire member four was factually inaccurate, proving purposeful discrimination by a preponderance of the evidence requires more than merely stating disagreement with, or correctly identifying factual error in, the prosecutor's explanations. *See Straughter v. State*, 801 S.W.2d 607, 613 (Tex. App.—Houston [1st Dist.] 1990, no pet.) ("It was appellant's burden to do more than simply state his disagreement with some of the prosecutor's explanations; he was required to prove affirmatively that the prosecutor's racially neutral explanations were a sham or pretext."). On this record, the inaccuracy of the prosecutor's stated reason is not indicative of purposeful discrimination. The prosecutor's explanation, though incorrect, could have been mistakenly grounded on another juror's response. *See, e.g., Ford,* 1 S.W.3d at 694 (mixing up answers from two jurors is not evidence of pretext); *Blackman,* 414 S.W.3d at 770-71 (premising explanation on mistaken recollection of juror's answer is not evidence of pretext).

Appellant does not direct us to other evidence in the record, beyond the factual inaccuracy of the prosecutor's explanation, tending to show a racially motivated animus. While courts have held that a number of factors, if present, tend to show purposeful discrimination, appellant does not identify any such factors here other than his argument about the prosecutor's factual error. *See Miller-El v. Dretke*, 545 U.S. 231, 240-63, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (considering the combined impact of a number of factors in concluding that prosecutors struck prospective jurors on racially discriminatory basis); *see also Whitsey*, 796 S.W.2d at 713-14 (setting

forth "nonexclusive list of factors which weigh against the legitimacy of a race-neutral explanation"). For example, he does not argue that the State engaged in disparate treatment or disparate questioning of venire members, which would require this court to engage in a comparative analysis of the State's strikes. *See Miller-El*, 545 U.S. at 240-52, 255-63, 125 S.Ct. 2317. Even if appellant made such an argument, he has presented no record of the panel's racial makeup in this case, thus precluding any comparative analysis of the State's strikes of minority and non-minority venire members. *See Whitsey*, 796 S.W.2d at 713-14.

The intermediate appellate court cases on which appellant relies are distinguishable or pre-date relevant Court of Criminal Appeals authority. In *Reich-Bacot v. State*, the prosecutor struck a potential juror because she "had in the past worked with people who were involved in criminal activity ... at a halfway house type situation." *Reich-Bacot v. State*, 789 S.W.2d 401, 403 (Tex. App.—Dallas 1990, pet. dism'd). The record reflected instead that the juror said she worked as a resident advisor with persons with disabilities, and the juror "clearly stated that she did not work with criminals." *Id.* at 403-04. The court of appeals reversed the trial court's *Batson* ruling, because the prosecutor's explanation was "wholly without support by the evidence," and the court did not believe it to be a "strike for mistake." *Id.* at 404. But *Reich-Bacot* predates *Ford* and, to the extent it conflicts with *Ford*'s holding that proof of a factual error alone is insufficient to prove pretext for a racially motivated strike, we decline to follow it.[6]

---

**6.** The same appellate court relied on *Reich-Bacot* in a later case, in which the court also reversed the trial court's *Batson* ruling because a prosecutor's explanation was contradicted by the record. *Greer v. State*, 310

S.W.3d 11, 18 (Tex. App.—Dallas 2009, no pet.). In *Greer*, however, the court acknowledged that a factually incorrect reason does not by itself show discriminatory intent, *id.* at 16 (citing *Ford*, 1 S.W.3d at 694), and ob-

Appellant also cites *Lewis v. State* for his argument that "the facts underlying the [State's] explanation must be supported by the record." But *Lewis* primarily concerned a comparative analysis of the State's strikes of minority and non-minority venire persons. *See Lewis v. State*, 775 S.W.2d 13, 15-17 (Tex. App.—Houston [14th Dist.] 1989, pet. ref'd).[7] As previously mentioned, however, appellant does not analyze comparatively the State's exercise of peremptory strikes as between minority and non-minority venire persons.

For this same reason, our opinion in *Jones v. State* is distinguishable. *See Jones v. State*, 431 S.W.3d 149 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). In *Jones*, we sustained an appellant's *Batson* argument and reversed for a new trial because the record indicated purposeful discrimination. *See id.* at 155-59. There, to be sure, the State's explanation for its strikes was contradicted by the record. *See id.* at 159-60. But in finding the trial court's acceptance of the State's explanation clearly erroneous, we relied on not only the factual inaccuracy of the State's reasons but also substantial comparative analysis data present in the record, which demonstrated the State's explanation was not genuine. Accordingly, we found the evidence sufficient to meet the defendant's burden of persuasion to prove a racially motivated strike, and the trial court's contrary ruling was clear error. *Id.* Contrary

to appellant's suggestion, *Jones* does not hold that an appellant may satisfy his burden of proving purposeful discrimination by showing nothing more than that the prosecutor's stated ground is contradicted by the record.

At bottom, appellant offers no evidence that would support his burden of proving that the State acted with purposeful discrimination in striking venire member four. Appellant does not challenge the genuineness of the prosecutor's race-neutral explanation, other than to prove that it was not in fact supported by the record. Under *Ford*, showing a prosecutor's reason to be factually incorrect "is not equal to proving that the reason given was a pretext for a racially motivated strike." *Ford*, 1 S.W.3d at 694. The trial court was in the best position to evaluate the prosecutor's demeanor, and we will not substitute our judgment for that of the trial court. *See Blackman*, 394 S.W.3d at 272 (Keyes, J., dissenting); *see also Ebong*, 2015 WL 1632713, at *4 (a finding regarding intentional discrimination largely turns on the trial court's evaluation of the prosecutor's demeanor and credibility).

Viewing the record in the light most favorable to the trial court's ruling, we conclude that the trial court's denial of appellant's *Batson* challenge was not clearly erroneous. *See Nieto*, 365 S.W.3d at 676.

We overrule appellant's first issue.

---

served that the record there presented did not show a simple mistake by the prosecutor. *Id.* at 18. Because *Greer* cites *Ford*, we do not construe *Greer* as suggesting that a prosecutor's factually incorrect reason for a strike is alone sufficient to prove the strike was racially motivated.

7. The court in *Lewis* also held that a peremptory strike was not supported by the record where the prosecutor struck a prospective juror because he "might be biased," but the prosecutor did not question the juror about a potential bias. *See Lewis*, 775 S.W.2d at 16-

17. This part of *Lewis* still does not support appellant's argument that a prosecutor's mistake is evidence of pretext, because the *Lewis* court found clear error in overruling the *Batson* challenge not because the prosecutor's stated reason was factually inaccurate but because "[i]ntuitive judgment or suspicion" is insufficient to rebut a presumption of discrimination. *Id. Lewis* is not on point here because the State did not strike venire member four based on an "intuitive judgment" or "suspicion." Regardless, *Lewis* pre-dates *Ford*, *Watkins*, and *Blackman*.

## Conclusion

Having overruled appellant's two issues, we affirm the trial court's judgment.