**Affirmed and Memorandum Opinion filed February 4, 2021.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-19-00140-CR

_____

**IVAN JOSEPH RANDLE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 338th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1433732**

## MEMORANDUM OPINION

A jury convicted appellant, Ivan Joseph Randle, of murder and sentenced him to confinement for fifty-five years in the Institutional Division of the Texas Department of Criminal Justice. Appellant timely brought this appeal. In two issues, appellant claims the evidence is insufficient to support the jury's verdict and the trial court erred by denying his challenge to the State's use of a peremptory strike. We affirm.

## I. SUFFICIENCY OF THE EVIDENCE

We first address appellant's second issue because success on this issue would afford him the greatest relief. *See* Tex. R. App. P. 43.3; *Campbell v. State*, 125 S.W.3d 1, 4 n.1 (Tex. App.–Houston [14th Dist.] 2002, no pet.) (stating reviewing court should first address complaints that would afford the greatest relief). Appellant contends the State failed to establish, beyond a reasonable doubt, that he is guilty of intentionally and knowingly causing the death of Carlos Martin by stabbing him with a knife. Appellant also contends the evidence is insufficient to support his conviction as a party to the offense.

### *Standard of Review*

We apply a legal-sufficiency standard of review in determining whether the evidence supports each element of a criminal offense that the State is required to prove beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, (1979); *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013); *see Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011). We examine all the evidence adduced at trial, whether admissible or inadmissible, in the light most favorable to the verdict to determine whether a jury was rationally justified in finding guilt beyond a reasonable doubt. *Temple*, 390 S.W.3d at 360; *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013). We consider both direct and circumstantial evidence, as well as any reasonable inferences that may be drawn from the evidence. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). "[W]e will uphold the verdict unless a rational factfinder must have had reasonable doubt as to any essential element." *Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009)

We do not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the factfinder. *See Williams v. State*, 235

S.W.3d 742, 750 (Tex. Crim. App. 2007). Because the jury is the sole judge of the witness's credibility and the weight given their testimony, we resolve any evidentiary conflicts or inconsistencies in favor of the verdict. *See Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000); *see also Marshall v. State*, 479 S.W.3d 840, 845 (Tex. Crim. App. 2016).

*The Evidence*

We summarize the evidence in light of appellant's claim that the DNA evidence at the scene does not establish he participated in or was a party to the offense. Appellant does not challenge other elements of the offense.

Witnesses saw three males enter Carlos Martin's home on the night of his death. A witness identified Rashad Tate as one of those men. Tate pled guilty to murder. The discovery of appellant's DNA at the crime scene led to his also being charged with the offense. Appellant testified at trial and admitted to being one of the three men entering Carlos's home. The identity of the third man remained unknown at the time of appellant's trial.

Sergeant Johnny Reyes was dispatched to a residence on Benford Drive, in Harris County, Texas, on February 19, 2013. Deputy Mike Alvarez arrived after Reyes. Reyes was approached by Lashonda Martin. The residence was the home of Carlos and Lashonda and their three children. A cousin of Carlos, B.W., was living with them at the time. Lashonda had left the home that evening while Carlos, B.W., and the three children remained. When Lashonda returned home three or four hours later, it was dark and her children and B.W. were outside, without Carlos. Lashonda put the children in the truck and walked to the side of the house. She looked through a window into the kitchen area and saw drawers open; she also saw a bloody knife and a gun on the counter. Lashonda called her sister and then the police. When an officer arrived, Lashonda told him that she had seen a knife

3

and a gun on the counter. Lashonda testified there was not a gun in the home and she never knew Carlos to own one. Lashonda said the only potential weapons in the home were the kitchen knives.

Reyes went to the front door, which was closed, while Alvarez went to the side of the residence. There was no response to Reyes's knock on the door. Alvarez could not enter the backyard because of two dogs and looked through a window with his flashlight. Alvarez saw a body, later identified as Carlos, on the floor near the front door. Officers forced their way inside and went through the residence.

Carlos was covered in blood from his feet to his upper torso. Blood covered the floor and a piano keyboard on the floor. No one else was found inside the home. The back door was ajar and there was blood on it. The television was on and it appeared the house had been ransacked – the furniture was in disarray, a mattress had been flipped over or moved, and drawers were left open. A closet had also been ransacked.

Lashonda's oldest son told police that Tate had been there earlier with two other men. Lashonda knew Tate, who used to come to their home at the Mint apartments before they moved to Benford Drive. Lashonda had never seen appellant before, had not heard his name, and to her knowledge he had not been inside the residence at Benford Drive.

Lashonda testified that she had seen Carlos smoke marijuana outside their home. Lashonda had never seen Carlos use any other type of drug and had never seen him sell drugs. However, she gave Sergeant James Dousay the name of "June Bug" as someone who might have been working on a dope deal with Carlos.

Dr. Michael Condron performed the autopsy. The autopsy revealed Carlos suffered 121 sharp-force injuries, six of which were life-threatening. Carlos had been stabbed multiple times and from multiple different directions. In addition, Carlos suffered blunt-force injuries. The injuries on his head were consistent with being pistol-whipped. The official cause of death was multiple blunt and sharp-force injuries and the manner of death was homicide. Sergeant Dousay testified that in his opinion there were multiple attackers.

Deputy Maurice Carpenter, a crime scene investigator with the Harris County Sheriff's Office, testified several knives were found that were used in the commission of the offense – three inside the residence and one outside in the backyard. The knives recovered from the scene all appeared to be part of a set in the house.

A broken knife blade was found near Carlos. A broken, black-colored knife handle and a piece of a broken knife handle were also in the entryway. A second knife was in the entryway. The third knife found inside was on the kitchen counter. All three knives were badly bent. Carpenter testified the bend could have been caused by hitting a human body with the knife. According to Carpenter, an assailant's hand could be cut if it slid down the knife as they were stabbing someone. If the DNA on the handle of a knife belonged to only one person, Carpenter testified that she would expect that person to be the assailant.

The gun on the kitchen counter had blood on it. The hammer was pulled back in the cocked position and the wooden grip was broken. The jury heard testimony that the grip could have been broken by using the gun to pistol-whip someone.

Fingerprints found on the interior side of the back door were identified as belonging to Tate. Blood and shoe prints were found on the fence in the backyard

of the Martins's house. The evidence indicated three people went across the fence. There was no evidence anyone left through the front door after the murder. The kitchen knife that was found outside was near the fence.

In the backyard of the house behind Martin's residence, on Bafing Drive, a piece of electronic musical equipment was found and there were dripped bloodstains on the patio. The blood trail led from that backyard onto Bafing Drive and down the street.

Kacie Waiters, a DNA analyst for Harris County Institute of Forensic Sciences, testified that appellant could not be excluded as a contributor of, i.e., his DNA was consistent with, the DNA found in twenty samples taken from the scene.

The four knives that appeared to have been used in the commission of the offense were swabbed: the knife in the backyard; the knife on the kitchen counter; the broken knife blade and handle in the entryway; and the unbroken knife in the entryway.

Appellant's DNA was on the two knives in the entryway and the knife on the counter. The unbroken knife in the entryway had DNA from at least two persons, one major contributor and one minor contributor. Appellant could not be excluded as a major contributor and Carlos could not be excluded as a minor contributor. Tate, Lashonda, B.W. and D.R.[1] were excluded. The blade also had a DNA mixture from which appellant and Carlos were not excluded but Tate was excluded.

The results from the broken-knife handle in the entryway were also consistent with DNA mixtures. Carlos was not excluded as a major contributor and appellant was not excluded as a minor contributor. Tate was excluded.

_____

[1] Although the record is not clear, it appears D.R. is a neighbor and the samples from the scene were also compared to his DNA.

The knife on the counter had a mixture of DNA from at least three persons – two major and one minor contributor. The comparison of Tate to the minor contributor was inconclusive. Appellant and Carlos could not be excluded as major contributors. Lashonda, B.W. and D.R. were excluded.

The .22 caliber cartridges inside the revolver had DNA consistent with appellant and Carlos as major contributors. Tate was excluded.

A carpet swab from the floor of the master bedroom contained DNA consistent with Carlos and Tate, as a major contributor. The DNA results from the box springs and the dresser drawer door handles in the master were consistent with mixtures of DNA from at least two persons, one major and one minor. No conclusions could be reach as to whether the DNA results were from one or more minor contributors. Appellant was not excluded as a major contributor. Tate, Carlos, Lashonda, B.W. and D.R. were excluded as major contributors.

DNA results from blood on the couch were consistent with appellant as a major contributor. Tate was excluded, as was Carlos, Lashonda, B.W., and D.R.

The DNA results from an Apple laptop were consistent with mixtures of DNA from at least two persons, one major and one minor. Appellant could not be excluded as a major contributor and Carlos could not be excluded as a minor contributor. Tate, Lashonda, B.W. and D.R. were excluded. The DNA results from another swab from the Apple laptop did not exclude appellant as a major contributor but did exclude Tate.

Appellant was not excluded as a contributor to samples taken from the hallway floor. Tate, Carlos, Lashonda, B.W. and D.R. were excluded from those samples.

Appellant was not excluded as a major contributor to DNA mixtures on swabs from the hall bathroom exterior doorknob and the exterior doorknob to the second bedroom. Tate was excluded from both.

DNA results from the swab of the fingerprint on the back door were consistent with two major contributors and at least one minor contributor. No interpretable results were obtained from the minor contributor. Carlos and Tate could not be excluded as major contributors. Appellant was excluded as a major contributor, as were Lashonda, B.W., and D.R.

The DNA results from a piece of a fence board were consistent with mixtures of DNA from at least two persons, one major and one minor. Appellant could not be excluded as a major contributor and Carlos could not be excluded as a minor contributor. Tate, Lashonda, B.W. and D.R. were excluded.

Appellant was not excluded as a contributor to samples taken from the patio bricks and sidewalk. Tate, Carlos, Lashonda, B.W. and D.R. were excluded from those samples.

Dr. Robert Benjamin testified for the defense. Benjamin stated that guidelines for interpreting DNA can vary between laboratories. He testified that one set of guidelines is not right and the other wrong but because of the variances, there can be a different interpretation of the results.

Benjamin testified that Tate could have been a contributor to the sample on the master bedroom box springs. That sample had DNA from at least two people, and he opined that perhaps three people touched it – appellant, Tate, and Carlos – or one person, who had contacted the others, touched it, and transferred their DNA to it. Benjamin testified the DNA on the dresser-drawer handles could also have been a secondary transfer and Tate could have been a contributor.

According to Benjamin, there was a possibility that the DNA on the gun and the handle of the knife on the countertop was put there by secondary transfer and that Tate could have been a contributor. Benjamin testified that Tate was a possible contributor to DNA on the knife found in the backyard, the interior knob of the back door, the handle on the broken knife in the entryway, and a sample taken from under Carlos's fingernails. In other words, in contrast to Waiters, Benjamin would not have excluded Tate as a possible contributor to the DNA on the box springs, the dresser-drawer handles, the gun, the knife on the counter, or the broken knife handle in the entryway, and he would have included appellant as a possible contributor to the DNA on the back door.

However, Benjamin agreed with Waiters's testimony that appellant's DNA was on at least 20 items in the house. He also agreed appellant's DNA was throughout the house, often mixed with someone else's DNA. According to Benjamin, including other persons as possible contributors did not remove appellant from being included. As he stated, "We added people. We didn't subtract anybody." Benjamin agreed that he did not suggest appellant was excluded as to any of the samples for which he had been included by Waiters.

The defense called Rashad Tate. After admitting that he pled guilty to the murder of Carlos and was currently serving a sentence for that offense, Tate repeatedly answered, "No comment."

Emilia Quintero, a criminal investigator for the defense, had interviewed Tate. She asked Tate about a statement he made to the district attorney that he would feel bad if an innocent person were prosecuted and Tate told Quintero that he would feel bad for anyone who was wrongly accused; he said appellant was in the wrong place at the wrong time. Tate told Quintero that he was having problems with Carlos, who owed him more than $10,000. Quintero had listened to an

9

interview Tate gave the district attorney at the Harris County Jail in which Tate said appellant "was probably scared and ran off." Tate told Quintero it was possible appellant was struggling with the third person. Tate said he pistol-whipped Carlos. He told Quintero that when he broke knives stabbing Carlos, he would get up and get another one from the kitchen.

Quintero admitted that during her investigation she had listened to at least four different versions given by Tate and stated that he tells the truth, "[w]hen it's convenient for him." Quintero agreed that in the interview at the Harris County Jail that she listened to, Tate repeatedly said that he was the only one who killed Carlos. Quintero testified that she did not believe Tate was planning to kill Carlos. Quintero said that she tried to convince Tate to tell the truth and he said, "there were certain things that he just wasn't going to say."

Appellant took the stand. He testified that his daily routine was to come home from school, buy some marijuana, and smoke it. He bought marijuana from someone named "Doc," whom he would meet at the bus stop. Appellant said he sometimes skipped school and went to the Mint apartments to smoke marijuana. He met Tate at the Mint apartments and saw him there several times.

According to appellant, on the day of the offense he took the bus to and from school. He called Doc on his way home and after dropping his bag off, went back to the bus stop to wait for him. Appellant was carrying his gun. He could not remember from whom, when, or where he bought the gun. While waiting for Doc, appellant saw Tate and another man he did not recognize. Appellant flagged down Tate and said he was waiting on his "weed man." Tate said he was going to "the weed man right now to pick up some money" and appellant could come.

Appellant testified they arrived at Carlos's residence a little after 3:00 p.m. Lashonda testified that she got home at 3:30 and did not leave again until after 5:00

p.m. Appellant said kids were playing in front and Carlos was in the doorway when they arrived. Appellant bought marijuana from Carlos and the four men smoked on the porch.

Appellant said he asked to go in and use the bathroom. He had to offer Carlos $20 to let him in and Carlos escorted him inside. A $20 bill was found in the entryway near Carlos's body. While appellant was in the bathroom, after about five minutes, he heard yelling. When he came out, after about ten or fifteen minutes, Tate and the third man were "on" Carlos. Tate was asking Carlos about money and Carlos was saying he did not have it. Carlos was on the floor with his hands up and saying that his kids were outside. It was discovered that Carlos had $700 in his pocket. Appellant said he never saw Carlos try to reach in his pocket and pull out the $700.

Appellant testified that Tate was on top of Carlos, "just swinging." Appellant could not tell if Tate or the other man had anything in their hands. Appellant told Tate that he was leaving and walked toward the door; Tate stood in front of him. Appellant tried to push Tate aside but as soon as he did, the third man was already swinging and hit appellant on the left side of his face. Appellant reached for his gun, but Tate and the other man rushed him, taking, or knocking the gun out of his hand; he heard it hit the floor. While Tate the third man were attacking appellant, he was trying to find his gun. Carlos tried to run for the door but Tate saw him and ran to stop Carlos.

According to appellant, the third man was still attacking him. Appellant tried to block him and got his hands up. Appellant saw the third man had a knife in his hand. Appellant was still looking for his gun on the floor and saw a knife; it was bent. Appellant pushed the third man away and picked up the knife. Appellant began using the knife to defend himself and eventually grabbed the knife out of the

11

other man's hand. Appellant then attacked him. The third man pushed appellant off and ran towards the kitchen. Tate and Carlos were fighting near the front door. Appellant saw the back door and ran out. He jumped the fence and ran towards his house.

Appellant testified that he had cuts on his forearm, hand, finger, face, head, and knee and was bleeding. Appellant said his eye was swollen shut. He testified that his aunt noticed it and he told her that he got in a fight or got jumped. Appellant's aunt testified at trial. There was no testimony that she had seen any injuries on appellant. Appellant's mother testified that when she saw appellant in March of 2013, she noticed he had a gash in his hand. She learned he sustained an injury on a fence.

Appellant did not recall ever going towards the couch. He testified that he was not in any other part of the house and did not know how his DNA got there. Appellant denied having contacted Carlos.

Appellant admitted that when he spoke to Sergeant Dousay in June of 2014, his version of events was completely different from his testimony at trial. Appellant agreed that the first time he recounted the version of events that he testified to at trial was in April 2018, after Tate pled guilty, and he did not have to worry how it would affect Tate. Appellant also admitted that his testimony at trial was after he had years to look at the State's evidence, including the photographs, and think about how to explain each situation.[2]

Appellant admitted that he told Dousay he bought his marijuana at school and did not buy it on the streets. Appellant also told Dousay that he walked to and

_____

[2] Appellant was first tried and convicted of murder in 2016. The trial court granted appellant a new trial. During appellant's second trial in 2018, the trial court granted a mistrial. This was not before the jury and therefore is not part of our review; it is offered only as context for appellant's testimony.

from school, "every day." He never said that he took the bus. According to appellant's aunt, appellant took the bus to school.

Appellant denied ever having been to the house on Benford Drive. When Dousay showed appellant a photograph of Tate, appellant denied knowing him. When Dousay told appellant that he was working a murder investigation and it was a "pretty vicious incident," appellant acted like he did not know what happened. Appellant said he felt like he was already a suspect. Appellant repeatedly denied knowing anything; that was his version of events for four years.

*Analysis*

The DNA evidence did not simply put appellant at the scene of the offense, as argued by appellant *See Clayton v. State*, 235 S.W.3d 772, 779 (Tex. Crim. App. 2009). We do not disagree that the presence of appellant's blood in the house, standing alone, would not sufficiently establish that appellant stabbed Carlos. *Id.* However, it does not stand alone.

The jury heard testimony that an assailant can cut their own hand on a knife when stabbing someone. Appellant testified to having cuts on his hand, which he said were caused by the knife fight with the third man. Either of these scenarios would explain the source of appellant's blood. It was for the jury to resolve the conflict. A rational juror could have disbelieved appellant and concluded the cuts on his hand were caused when he stabbed Carlos. *See Finley v. State,* 529 S.W.3d 198, 203–05 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd) (From a witness's testimony that the cut on defendant's hand could have resulted when his hand slipped from a knife handle, the jury could infer the defendant cut his hand while stabbing victim).

Appellant's DNA was mixed with Carlos's DNA in multiple samples. The mixture is evidence that appellant was close enough to Carlos for his blood to be transferred to appellant. Appellant denied having come in contact with Carlos. The mixture is evidence that further links appellant to Carlos's injuries and discredits appellant's testimony. *See id*.

The jury heard evidence that the gun belonging to appellant was used to pistol-whip Carlos and appellant's DNA was found along with Carlos's DNA on the bullets inside the gun. From this evidence, a rational juror could have believed it was appellant who pistol-whipped Carlos.

Appellant's DNA was on two knives used to stab Carlos. The jury heard testimony that if the DNA on the handle of a knife belonged to only one person, it was to be expected that person was the assailant. There was evidence in the record from which the jury could have concluded only appellant's DNA was on the knife handle. From this evidence, the jury could have believed appellant stabbed Carlos.

In appellant's version of events, he never entered the bedroom. The jury heard evidence that appellant's DNA was on the box springs and dresser drawer handles. The jury heard testimony it could have been there because of secondary transfer. It was for the jury to determine whether appellant searched the bedroom.

Appellant testified that he opened the back door and left first, while Carlos was still alive. However, Tate's fingerprint was on the back door. From this evidence, the jury could have determined he fled first and appellant's testimony was not credible.

By his own testimony, appellant fled the scene. A factfinder may draw an inference of guilt from the circumstance of flight. *See Clayton*, 235 S.W.3d at 780.

Additionally, appellant did not call police or tell anyone about the murder. When questioned by police, appellant denied having even been present. Appellant admitted that his testimony at trial was completely inconsistent with the statement he gave police four years earlier.

It was for the jury to determine appellant's credibility and resolve the conflicts between his testimony and the other evidence. Clearly, the jury rejected appellant's version of events and resolved the conflicts in the evidence against him. Having examined all the evidence adduced at trial in the light most favorable to the verdict and considering any reasonable inferences that may be drawn from that evidence, we cannot say that a rational juror must have had reasonable doubt that appellant was guilty. *See Temple*, 390 S.W.3d at 360; *Laster*, 275 S.W.3d at 518; *Clayton*, 235 S.W.3d at 778. We conclude the evidence is legally sufficient to the support the jury's verdict. Issue two is overruled.

## II. *BATSON* CHALLENGE

Appellant is an African American male. The State exercised a peremptory strike on juror 21, also African American. In his first issue, appellant claims the trial court erred by denying his *Batson* challenge to the State's use of that strike. *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

*Standard of Review* Counsel is prohibited from exercising peremptory strikes based on race. *Batson,* 476 U.S. at 89, 106 S.Ct. 1712; *see* U.S. Const. amend. XIV, § 1. Excluding a juror based on race invalidates the jury selection process, requiring a new trial. *Davis v. Fisk Elec. Co*., 268 S.W.3d 508, 521 (Tex. 2008). Generally, counsel is not required to explain or justify peremptory strikes, unless a challenge is made under *Batson*. *See Lewis v. State*, 911 S.W.2d 1, 4 (Tex. Crim. App. 1995); *see also* Tex. Code Crim. Proc. art. 35.14.

A *Batson* challenge consists of three steps. *Nieto v. State*, 365 S.W.3d 673, 675-76 (Tex. Crim. App. 2012). First, the objecting party must make a prima facie case of discrimination. *Id*. Second, the striking party must tender race-neutral reasons for the strike. *Id*. Third, if race-neutral reasons are tendered, the objecting party must prove purposeful discrimination. *Id*. The trial court's ruling on whether purposeful discrimination has been proven must be sustained unless it is clearly erroneous. *Id*. "The clearly erroneous standard is highly deferential because the trial court is in the best position to determine if the prosecutor's explanation is genuinely race neutral." *Id*.

*Analysis*

When the strike of juror 21 was challenged, the State offered the following race-neutral reasons:

> On 21 we had her down as an R3,[3] as a teacher, and she also had her headphones on during the process of us deciding who was going to be picked. At one time, when Mr. Davis said "I only have one question -- well, you know what, I have 2 questions, 3 questions," she rolled her eyes -- made an audible gesture as if to say she didn't want to be here. So as to the race neutral reason why 21 is not on -- why she was struck, we got the vibe she did not want to be a part of this process, Your Honor -- as to 21.

The trial court stated, "I believe the State has met their burden of proof [;] it is a race neutral reason for being excused." Appellant did not argue the reason was not race neutral nor proffer any evidence or argument of purposeful discrimination.

On appeal, appellant argues that the State failed to proffer a race-neutral reason. The State's use of a peremptory strike on a juror because she was "an R3" is a race-neutral reason.

---

[3] This refers to her feelings that the goal should be rehabilitation, rather than punishment.

16

The record reflects that several venire members who were teachers expressed concern about missing school. The State's striking of juror 21 because she was a teacher is a race-neutral reason.

The State described juror 21's conduct that led it to believe she "didn't want to be here," also a race-neutral reason for striking her. Appellant made no claim at trial that juror 21 was not wearing headphones during voir dire or did not roll her eyes when the prosecutor said he had more questions. The State's striking of juror 21 based upon her conduct during voir dire is a race-neutral reason.

Once the State tendered race-neutral reasons for striking juror 21, it became appellant's burden to prove purposeful discrimination. *See Nieto*, 365 S.W.3d at 675-76. As noted above, appellant did not proffer any evidence or argument of purposeful discrimination to meet his burden. Accordingly, the trial court's ruling is not clearly erroneous and must be sustained. *Id.* Issue one is overruled.

### III. CONCLUSION

Having overruled appellant's issues, we affirm the trial court's judgment.

/s/     Ken Wise
          Justice

Panel consists of Chief Justice Christopher and Justices Wise and Zimmerer.

Do Not Publish — Tex. R. App. P. 47.2(b).

17