# NO. 12-16-00225-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *GREGORY DEWAYNE TENNYSON,* *APPELLANT* | § | *APPEAL FROM THE 241ST* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,* *APPELLEE* | § | *SMITH COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Gregory Dewayne Tennyson appeals his conviction for aggravated assault on a public servant. Appellant raises five issues challenging the trial court's rulings regarding a ***Batson*** challenge and certain jury instructions, the sufficiency of the evidence, and the constitutionality of the court cost assessment. We affirm.

## BACKGROUND

Appellant was charged by indictment with aggravated assault on a public servant. He pleaded "not guilty," and the matter proceeded to a jury trial.

At trial, the evidence showed that Smith County Sheriff's Deputy Clayton Taylor initiated a traffic stop on Appellant in Tyler for having an unreadable license plate and white light emanating from the rear of his vehicle. After obtaining Appellant's driver's license, Taylor conducted a computer check and learned that there was a warrant for Appellant's arrest. Taylor asked Appellant to step out of the vehicle. Appellant instead drove away, leading Taylor and other law enforcement officers on a pursuit that ended in neighboring Wood County. At one point in the pursuit, Appellant stopped his vehicle, placed it in reverse gear, and rammed Taylor's patrol car while Taylor was attempting to exit the vehicle to arrest him.

The indictment charged Appellant with threatening Deputy Taylor while using or exhibiting a deadly weapon, specifically, a motor vehicle.[1]  Ultimately, the jury found Appellant "guilty" of aggravated assault on a public servant and assessed his punishment at imprisonment for life.  This appeal followed.

*BATSON* CHALLENGE

In Appellant's first issue, he argues that the trial court erred in overruling his *Batson* challenge because the State improperly exercised peremptory strikes against three African American venire members.

**Standard of Review and Applicable Law**

The use of a peremptory challenge to strike a potential juror because of race violates the equal protection guarantee of the United States Constitution and Article 35.261 of the Texas Code of Criminal Procedure.  *See Batson v. Kentucky*, 476 U.S. 79, 86, 106 S. Ct. 1712, 1717, 90 L. Ed. 2d 69 (1986); *see also* TEX. CODE CRIM. PROC. ANN. art. 35.261 (West 2006).  In the face of perceived purposeful discrimination, a party may request a *Batson* hearing.  *See* TEX. CODE CRIM. PROC. ANN. art. 35.261.

*Batson* provides a three step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race.  *Snyder v. Louisiana*, 552 U.S. 472, 476-77, 128 S. Ct. 1203, 1207, 170 L. Ed. 2d 175 (2008); *Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008).  The opponent of a peremptory challenge first must make a prima facie case that the peremptory challenge was exercised on the basis of race.  *Snyder*, 552 U.S. at 476, 128 S. Ct. at 1207; *Watkins*, 245 S.W.3d at 447.  If that showing has been made, the burden of production shifts to the proponent of the strike to offer a race neutral basis for striking the juror in question. *Snyder*, 552 U.S. at 476-77, 128 S. Ct. at 1207; *Watkins*, 245 S.W.3d at 447. The issue in step two is the facial validity of the prosecutor's explanation, and "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Purkett v. Elem*, 514 U.S. 765, 768, 115 S. Ct. 1769, 1771, 131 L. Ed. 2d 834 (1995); *see also Williams v. State*, 301 S.W.3d 675, 689 (Tex. Crim. App. 2009).  In the third and final step, the trial court must determine whether the opponent of the strike has carried his burden to prove purposeful

---

[1] The indictment's second paragraph charged Appellant with causing bodily injury to Deputy Taylor.  The second paragraph was excluded from the trial court's reading of the indictment to the venire panel and from the jury charge.  Therefore, we presume that the State abandoned the second paragraph.

discrimination. *Snyder*, 552 U.S. at 477, 128 S. Ct. at 1207; *Young v. State*, 283 S.W.3d 854, 866 (Tex. Crim. App. 2009). Throughout the challenge, the burden of persuasion remains with the defendant, who may continue to rebut the prosecutor's explanations before the trial court decides the *Batson* challenge. *Moore v. State*, 265 S.W.3d 73, 78 (Tex. App.–Houston [1st Dist.] 2008, no pet.).

Where the State offers a race neutral explanation for the strikes, the defendant must prove that the prosecutor's reasons were merely a sham or pretext. *Watkins*, 245 S.W.3d at 447. The ultimate plausibility of that race neutral explanation is to be considered as part of the third step of the analysis, in which the trial court determines whether the opponent of the strike has satisfied his burden of persuasion to establish by a preponderance of the evidence that the strike was indeed the product of the proponent's purposeful discrimination. *Id.* Whether the opponent satisfies his burden of persuasion to show that the proponent's facially race neutral explanation for his strike is pretextual, not genuine, is a question of fact for the trial court to resolve in the first instance. *Id.*

We examine a trial court's ruling on a *Batson* challenge under the "clearly erroneous" standard of review. *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004); *Goldberg v. State*, 95 S.W.3d 345, 385 (Tex. App.–Houston [1st Dist.] 2002, pet. ref'd). To hold that a decision was clearly erroneous, we must be left with a definite and firm conviction that a mistake has been committed. *Goldberg*, 95 S.W.3d at 385. The clearly erroneous standard is a highly deferential standard because the trial court is in the best position to determine whether the State's facially race neutral explanation for a peremptory strike is genuinely race neutral. *Gibson*, 144 S.W.3d at 534. We focus on the genuineness rather than on the reasonableness of the State's asserted race neutral reason. *Id.* at 533-34.

In evaluating the genuineness of the State's proffered race neutral reason, we consider whether (1) the reason is related to the facts of the case, (2) the State meaningfully questioned the challenged venire member, (3) persons with the same or similar characteristics as the challenged venire member were not struck, (4) there was disparate examination of the venire members, and (5) an explanation was based upon a group bias although the trait is not shown to apply to the challenged venire member. *Williams v. State*, 804 S.W.2d 95, 105-06 (Tex. Crim. App. 1991). We consider the entire voir dire record and need not limit our review to the specific arguments propounded in the trial court. *Nieto v. State*, 365 S.W.3d 673, 676 (Tex. Crim. App. 2012).

3

## Prima Facie Showing

At the conclusion of voir dire, Appellant raised a ***Batson*** challenge to the State's peremptory strikes of Venire Members 14, 15, and 30. The record reflects that Appellant is African American, as are the three venire members. These three were the only African American venire members within the strike zone. The trial court determined that Appellant established a prima facie case and asked the State to produce race neutral reasons for the strikes. The State produced its reasons without objection.

Once the proponent of a strike offers an explanation for striking the venire member and the trial court rules on the ultimate question of intentional discrimination, the issue of whether the opponent of the strike made a prima facie case is moot and not subject to appellate review. ***Malone v. State***, 919 S.W.2d 410, 412 (Tex. Crim. App. 1996). In this case, because the State offered its explanations, we need not determine whether Appellant established a prima facie case of racial discrimination. *See **id.***

## Race Neutral Explanations

Regarding its strike of Venire Member 14, the State provided the following explanation:

> [She] is employed as a manager of a McDonald's with a two-year degree. This is unskilled labor that we're familiar with, in our experience as prosecutors in cases like this, that lend—type of work experience that would lend itself to be sympathetic toward criminal defendants.
>
> In addition to that, [Venire Member 14] was called to the bench and questioned with regards to her family's criminal history. One of those she indicated was a man by the name of Kelvin Bowie. Our office prosecuted Kelvin Bowie for murder here in Smith County. That would lead me to believe she might carry a bias against the Smith County District Attorney's Office in a subsequent criminal prosecution.
>
> . . . .
>
> In addition to that, Your Honor, she indicated that she favored rehabilitation over punishment with regards to consideration when assessing a sentence.

Regarding its strike of Venire Member 15, the State provided the following explanation:

> [He] is a custodian which is also unskilled labor with a two-year degree. He indicated in the punishment section of the voir dire that he favored rehab over punishment in terms of assessing sentences in criminal cases. In addition to that, he served previously on a Smith County jury and assessed a sentence on the lower end of the punishment range in that case.
>
> For those reasons, I've chosen to strike him in a case where he would be asked to assess sentence in a case that's 15 to life.

4

Regarding its strike of Venire Member 30, the State provided the following explanation:

> [I]t's my opinion she would not be a favorable State's juror because she is a technician that does not hold a certification or license at Trinity Mother Frances. That indicates to me it is also unskilled labor. She also indicated during the punishment phase of the voir dire that she favored rehab over punishment. She also indicated on her jury card that she was single with no children with a high school education only.
>
> Based on my training and experience, based on my experience as a prosecutor in Smith County, those would be factors that would indicate someone who would not be a favorable State's juror in a case such as this one.

No discriminatory intent is inherent in the prosecutor's explanations. Therefore, we conclude that the reasons offered are race neutral. *See Purkett*, 514 U.S. at 768, 115 S. Ct. at 1771; *see also Williams*, 301 S.W.3d at 689. This satisfies the State's burden of production. *See Watkins*, 245 S.W.3d at 451; *see also Finley v. State*, 529 S.W.3d 198, 206 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd).

**Genuineness of Explanations**

After the State's burden of producing race neutral explanations was satisfied, the burden shifted to Appellant to prove that the proffered explanations were mere pretext for purposeful discrimination. *See Blackman v. State*, 414 S.W.3d 757, 764 (Tex. Crim. App. 2013). At this step, "[t]he trial court has a pivotal role in evaluating *Batson* claims," because the trial court must evaluate the prosecutor's credibility, and "the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge." *Snyder*, 552 U.S. at 477, 128 S. Ct. 1203 (internal quotation omitted); *see also Blackman v. State*, 394 S.W.3d 264, 271 (Tex. App.—Houston [1st Dist.] 2012) (Keyes, J., dissenting), *rev'd*, *Blackman*, 414 S.W.3d at 771. "An appellate court misapplies the 'clearly erroneous' standard of appellate review when it substitutes its judgment for that of the trial court in deciding that the prosecutor's facially race-neutral explanation for striking a venire member was a pretext." *Blackman*, 394 S.W.3d at 272 (Keyes, J., dissenting) (citing *Gibson*, 144 S.W.3d at 534).

On appeal, Appellant argues that the State's race neutral reasons "could have been resolved by further questioning." He contends the facts that the State (1) called only one of the three contested venire members for individual questioning, and (2) used three of its peremptory strikes to eliminate 100% of the minorities in the strike zone show that the State's proffered reasons were a pretext for purposeful discrimination.

5

We turn to the voir dire record to assess whether the trial court's ruling was clearly erroneous. *See Nieto*, 365 S.W.3d at 676. Regarding Venire Member 14, the prosecutor testified that she was struck because she was employed in unskilled labor, his office prosecuted her relative for murder, and she favored rehabilitation over punishment. The record shows that at the conclusion of the voir dire, the venire member approached the bench and stated that three of her family members were prosecuted by the Smith County District Attorney's Office for various offenses, including murder. The venire member affirmed that she could disregard those prosecutions if she were selected as a juror and follow the law in this case. On cross-examination, the prosecutor testified that he believed the venire member might nonetheless harbor a bias against his office. Venire Member 14's juror card confirms that she is African American, has a two-year college degree, and works at McDonald's as a shift manager.

Regarding Venire Member 15, the prosecutor testified that he was struck because he was employed in unskilled labor, had assessed a low punishment in previous jury service, and favored rehabilitation over punishment. The voir dire record shows that when the State asked the venire panel whether anyone had served on a criminal jury before, Venire Member 15 said that he served on a criminal jury in Smith County, and the jury assessed punishment in the case. On cross-examination, the prosecutor testified that the venire member served as a juror in a drug possession case in Smith County. The jury found the defendant guilty and assessed his punishment "at the lower end of the punishment range" even though he had prior felony convictions. Venire Member 15's card confirms that he is African American, has a two-year college degree, and works as a school custodian.

Regarding Venire Member 30, the prosecutor testified that she was struck because she was employed in unskilled labor, favored rehabilitation over punishment, had no children, and had only a high school education. On cross-examination, he elaborated on the first reason as follows:

> [Venire Member 30] listed unit tech at Trinity Mother Frances Hospital; however, she only holds a high school degree, has no licenses or certifications for which she would be employed in a skilled labor capacity. That indicates to me she works in the lower level of labor at Trinity Mother Frances Hospital, probably in some sort of care capacity that would make her sympathetic for individuals in circumstances that may be perceived as dire.

6

Venire Member 30's card confirms that she is African American, has a high school diploma, and works as a hospital unit technician.

After reviewing the entire voir dire record and giving proper deference to the trial court, we cannot say that its decision was clearly erroneous based on a lack of individual questioning and the fact that all African American venire members within the strike zone were struck. *See Gibson*, 144 S.W.3d at 534. First, a lack of meaningful questioning might be sufficient to support a *Batson* challenge under the appropriate circumstances, but it is not necessarily dispositive of the issue of purposeful discrimination. *Grant v. State*, 325 S.W.3d 655, 656, 660 (Tex. Crim. App. 2010). The evidentiary value of a lack of questioning is likely significantly less when jurors are examined in a group. *Id.* at 659. A written response to a written question can be just as valid an explanation for a strike as an oral response to an oral question. *Id.* at 661.

Here, the record shows that the venire members were examined in a group rather than individually, thus significantly lowering the evidentiary value of the lack of questioning. *See id.* Additionally, the venire members provided written responses to written questions on the juror cards, which are just as valid explanations for the strikes as oral responses to oral questions would have been. *See id.* Thus, we cannot conclude that the trial court erred based on the lack of questioning alone.

Nor can we conclude that the trial court erred based on the lack of questioning combined with the State's striking of all three African American venire members within the strike zone. *See Nieto*, 365 S.W.3d at 679. Other evidence, such as disparate treatment of minority and nonminority venire members, is more powerful than bare statistics. *Id.* Courts identify disparate treatment using a side-by-side comparison, or "comparative analysis," of venire members of a particular race who were struck and venire members of other races who were not struck. *Jones v. State*, 431 S.W.3d 149, 156 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

In this case, we are unable to compare the treatment of the venire members on the issues of education, employment, marital status, and parental status because the juror cards of only the three contested venire members were admitted into evidence. However, we can perform a comparative analysis on the issue of favoring rehabilitation or punishment. Our review of the voir dire record reveals that of the ten venire members struck by the State, nine favored

7

rehabilitation and one favored punishment.[2]  Thus, in addition to the three African American venire members who favored rehabilitation, six nonblack venire members who favored rehabilitation were struck by the State.  However, ten nonblack potential jurors who favored rehabilitation were not struck by the State.[3]

Despite the fact that the State struck all of the African American potential jurors who favored rehabilitation and only six of the sixteen nonblack potential jurors who favored rehabilitation, we cannot say that our comparative analysis reveals clear evidence of discrimination.  Having only ten peremptory strikes available to use, the State could not strike all venire members who favored rehabilitation.  The State could plausibly have used the rehabilitation factor along with its other proffered reasons to decide to strike the three venire members and not others without the existence of racial discrimination.

Based on the record before us, we do not have a firm and definite conviction that the State engaged in racial discrimination.  *See **Nieto***, 365 S.W.3d at 676, 679 (no clear error in overruling ***Batson*** challenge where State struck all five black prospective jurors and did not question contested venire member); *see also **Goldberg***, 95 S.W.3d at 385.  Therefore, we cannot conclude that the trial court clearly erred in overruling Appellant's ***Batson*** challenge.  *See **Gibson***, 144 S.W.3d at 534.  Accordingly, we overrule Appellant's first issue.

## EVIDENTIARY SUFFICIENCY

In Appellant's second issue, he argues that the evidence supporting the deadly weapon element of the offense is legally insufficient.

### Standard of Review and Governing Law

The due process guarantee of the Fourteenth Amendment requires that a conviction be supported by legally sufficient evidence.  *See **Jackson v. Virginia***, 443 U.S. 307, 315-16, 99 S. Ct. 2781, 2786–87; ***Brooks v. State***, 323 S.W.3d 893, 917 (Tex. Crim. App. 2010).  The inquiry on a legal sufficiency review of the evidence to support a criminal conviction is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt after viewing the evidence in the light most favorable to the prosecution.  ***Drichas v. State***,

---

[2] The one who favored punishment additionally indicated that he previously served as a juror in a case that ended in a mistrial.

[3] We note that only four of these ten were placed on the jury.

8

175 S.W.3d 795, 798 (Tex. Crim. App. 2005). This requires the reviewing court to defer to the jury's credibility and weight determinations, because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. **Brooks**, 323 S.W.3d at 899; *see* **Jackson**, 443 U.S. at 319, 99 S. Ct. at 2789. A "court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." **Jackson**, 443 U.S. at 326, 99 S. Ct. at 2793.

To be legally sufficient to sustain a deadly weapon finding, the evidence must demonstrate that (1) the object meets the statutory definition of a deadly weapon, (2) the deadly weapon was used or exhibited during the transaction from which the felony conviction was obtained, and (3) other people were put in actual danger. *See* **Drichas**, 175 S.W.3d at 798. The definition of "deadly weapon" includes "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." TEX. PENAL CODE ANN. § 1.07(a)(17)(B) (West Supp. 2017).

Objects that are not usually considered deadly weapons may become so based on the manner of their use during the commission of an offense. **Drichas**, 175 S.W.3d at 798. A motor vehicle may become a deadly weapon if the manner of its use is capable of causing death or serious bodily injury. **Id.** Specific intent to use a motor vehicle as a deadly weapon is not required. **Id.**

To prove Appellant guilty of aggravated assault on a public servant as alleged, the State was required to prove that he (1) intentionally or knowingly threatened imminent bodily injury to Deputy Taylor, (2) used or exhibited a deadly weapon, specifically, a motor vehicle, during the commission of the assault, (3) knew that Taylor was a public servant, specifically, a Smith County Sheriff's Deputy, and (4) knew that Taylor was lawfully discharging an official duty, specifically, attempting to detain him pursuant to a warrant. *See* TEX. PENAL CODE ANN. § 22.02(a)(2), (b)(2)(B) (West 2011).

**Analysis**

Appellant does not dispute the fact that he put his vehicle in reverse gear and backed into Deputy Taylor's patrol car. However, he argues that the evidence fails to establish the level of danger required to render the vehicle a deadly weapon. We disagree.

Appellant first argues that the deadly weapon evidence is insufficient because it does not show that anyone was put in actual danger. *See Drichas*, 175 S.W.3d at 798. In support of his contention, he asserts that Deputy Taylor was not harmed and the patrol car sustained only minor damage. This argument is without merit for two reasons. First, as Appellant acknowledges, evidence of injuries to an assault victim may be considered in determining whether an object constituted a deadly weapon, but such evidence is not required. *See Lane v. State*, 151 S.W.3d 188, 191 (Tex. Crim. App. 2004). Furthermore, Taylor testified that his head and neck were jarred by the crash, causing him physical discomfort. In Taylor's in-car video, one can hear an audible "Ugh!" as the car is hit. Regarding the damage to the patrol car, the evidence shows that the siren on the push bumper was pushed back into the car's grille, and the plastic molding on the push bumper was punctured and torn. These injuries to Taylor and damage to his car tend to show that Taylor was put in actual danger.

Appellant further argues that the deadly weapon evidence is insufficient because the evidence supports a conclusion that the crash was an accident and he did not have the intent to cause death or serious bodily injury. While some evidence—namely, Appellant's testimony—supports such a conclusion, it does not render the deadly weapon evidence insufficient. First, while the State was required to prove that the crash was not an accident, it was not required to prove that Appellant had the specific intent to cause death or serious bodily injury. *See Drichas*, 175 S.W.3d at 798.

Moreover, although Appellant's testimony supports a conclusion that the crash was an accident, the jury was free to disbelieve him and infer from other evidence that it was intentional or knowing. *See Brooks*, 323 S.W.3d at 899; *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *see also Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (jury may infer intent or knowledge from any facts that tend to prove their existence, including defendant's acts, words, and conduct). When asked why he backed into Deputy Taylor's patrol car, Appellant testified as follows:

> It wasn't—I really didn't know how far he was behind me, but I stopped. I panicked, because I thought I was in the middle of Martin Luther King. It's hard to kind of—the Suburbans have tint on the back of them, and so with him having the lights real bright, all you can see is the lights hitting you in the face off the rearview mirrors. And I thought I was in the middle of Martin Luther King, and the first thing I was thinking was I'm fixing to get hit by oncoming traffic, because at that time of night there's a lot of drunk people that don't really pay attention to stop signs and lights, period. And so that's why I stopped and waited. And then I put it in reverse to back up, and as soon as I felt that I hit him I took off because I didn't realize he was that close.

Though somewhat implausible, Appellant's testimony could support an inference that the crash was accidental. However, other evidence shows that instead of stopping to check on Deputy Taylor's condition, Appellant put his vehicle in drive and continued to flee, leading law enforcement officers on a dangerous, high speed chase. Once law enforcement vehicles surrounded him on a residential street, he cursed at the officers and refused to exit the vehicle. When several officers approached to arrest Appellant, he suddenly accelerated forward, squealing his tires and fishtailing. He crashed into two patrol cars, one of which hit a third patrol car from the force of the impact. One patrol car was totaled in the process. This evidence supports the jury's implied finding that Appellant's conduct in backing into Taylor's patrol car was intentional or knowing. *See Manrique*, 994 S.W.2d at 649.

Viewing the evidence in the light most favorable to the verdict, a rational jury could find beyond a reasonable doubt that Appellant not only intentionally or knowingly threatened Deputy Taylor with imminent bodily injury, but also used his vehicle in a manner capable of causing death or serious bodily injury. *See Dolkart v. State*, 197 S.W.3d 887, 891 (Tex. App.—Dallas 2006, pet. ref'd) (deadly weapon evidence sufficient where defendant used vehicle to hit bicyclist causing minor injuries); *see also Callison v. State*, 218 S.W.3d 822, 827 (Tex. App.—Beaumont 2007, no pet.) (deadly weapon evidence sufficient where defendant used vehicle to ram patrol car with state trooper hanging through window); *Dobbins v. State*, 228 S.W.3d 761, 767-68 (Tex. App.—Houston [14th Dist.] 2007, pet. dism'd) (deadly weapon evidence sufficient where defendant used vehicle to hit deputy at five to ten miles per hour lifting him onto hood). Thus, the evidence is sufficient to support the deadly weapon element of the charged offense. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *see also Brooks*, 323 S.W.3d at 899; TEX. PENAL CODE ANN. § 1.07(a)(17)(B). Accordingly, we overrule Appellant's second issue.

CHARGE ERROR

In Appellant's third and fourth issues, he complains that the trial court erred by denying his requests for instructions on necessity and Article 38.23 of the Texas Code of Criminal Procedure.

**Standard of Review**

The review of an alleged jury charge error in a criminal trial is a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). First, an appellate court must

11

determine whether there was error in the jury charge. *Id.* Then, if there is charge error, the court must determine whether there is sufficient harm to require reversal. *Id.* at 731-32. The standard for determining whether there is sufficient harm to require reversal depends on whether the appellant objected to the error at trial. *Id.* at 732.

If the appellant objected to the error, the appellate court must reverse the trial court's judgment if the error "is calculated to injure the rights of the defendant." TEX. CODE CRIM. PROC. ANN. art. 36.19 (West 2006). This means no more than that there must be some harm to the accused from the error. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). An appellant who did not raise the error at trial can prevail only if the error is so egregious and created such harm that he has not had a fair and impartial trial. *Id.* "In both situations the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id.*

The record must show that the defendant suffered actual harm, not merely theoretical harm. *Id.* at 174. In assessing whether the trial court erred by denying a requested defensive instruction, an appellate court must examine the evidence offered in support of the defensive issue in the light most favorable to the defense. *Farmer v. State*, 411 S.W.3d 901, 906 (Tex. Crim. App. 2013).

## Necessity Instruction

A defendant is entitled to an instruction on every defensive issue raised by the evidence, regardless of whether the evidence is strong, feeble, unimpeached, or contradicted, and even when the trial court thinks that the testimony is not worthy of belief. *Walters v. State*, 247 S.W.3d 204, 209 (Tex. Crim. App. 2007). This rule is designed to insure that the jury, not the judge, will decide the relative credibility of the evidence. *Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999).

To raise a defensive issue, the evidence must raise each element of the defense. *Stefanoff v. State*, 78 S.W.3d 496, 499 (Tex. App.–Austin 2002, pet. ref'd). "If evidence is such that a rational juror could accept it as sufficient to prove a defensive element, then it is said to 'raise' that element." *Id.* The defendant's testimony alone may be sufficient to raise a defensive issue. *Williams v. State*, 630 S.W.2d 640, 643 (Tex. Crim. App. 1982).

When evidence from any source raises a defensive issue, and the defendant properly requests a jury charge on it, the trial court must submit the issue to the jury. *Muniz v. State*, 851 S.W.2d 238, 254 (Tex. Crim. App. 1993). Thus, if the issue is raised by any party, refusal to submit the requested instruction is an abuse of discretion. *Darty v. State*, 994 S.W.2d 215, 218 (Tex. App.–San Antonio 1999, pet. ref'd). When reviewing a trial court's refusal to submit a defensive instruction, we view the evidence in the light most favorable to the requested instruction. *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006).

The Penal Code provides that

> [c]onduct is justified if:
> (1) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm;
> (2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and
> (3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear.

TEX. PENAL CODE ANN. § 9.22 (West 2011). The requirements of subsections 9.22(1) and (2) must be satisfied by evidence, while subsection (3) presents a question of law. *Pennington v. State*, 54 S.W.3d 852, 857 (Tex. App.–Fort Worth 2001, pet. ref'd). Additionally, a defendant must admit to the conduct—the act and the culpable mental state—of the charged offense to be entitled to a necessity instruction. *Juarez v. State*, 308 S.W.3d 398, 399 (Tex. Crim. App. 2010).

A "reasonable belief" is one "that would be held by an ordinary and prudent man in the same circumstances as the actor." TEX. PENAL CODE ANN. § 1.07(a)(42). "Imminent" means something that is impending, not pending; something that is on the point of happening, not about to happen. *Pennington*, 54 S.W.3d at 857. Harm is imminent when there is an emergency situation and it is immediately necessary to avoid that harm. *Id.* In other words, a split-second decision is required without time to consider the law. *Id.*

Evidence of a generalized fear of harm is not sufficient to raise the issue of imminent harm. *Brazelton v. State*, 947 S.W.2d 644, 648 (Tex. App.–Fort Worth 1997, no pet.). If undisputed facts indicate a complete absence of immediate necessity or imminent harm, then a defendant's belief that his conduct is immediately necessary to avoid imminent harm is

13

unreasonable as a matter of law. ***Dewalt v. State***, 307 S.W.3d 437, 454 (Tex. App.–Austin 2010, pet. ref'd).

In Appellant's third issue, he argues that the trial court erred by denying his request for an instruction on the defense of necessity. He contends that he was entitled to a necessity instruction because (1) he admitted every element of the offense, and (2) there is some evidence that he acted out of necessity. The record does not support either of these contentions.

To be entitled to a necessity instruction, Appellant was required to admit to every element of the offense, including not just the acts but also the culpable mental state. *See **Juarez***, 308 S.W.3d at 399. In an attempt to meet the requirement of admitting the culpable mental state, defense counsel tried to elicit testimony from Appellant that he intentionally hit the patrol car for the same reason he initially fled. Appellant explained why he initially fled from Deputy Taylor as follows:

> Because I wanted to get somewhere where somebody could see what was happening, because I don't—I've been in incidents because of my past where they feel like I'm just a majorly dangerous individual and they feel—I've been assaulted by officers before . . . .
>
> And the general attitude by the police department and the sheriff's department that's up here is that anybody with any kind of a record that's been in any kind of trouble before, they feel like you're an extremely dangerous individual and they strike first. I mean, that's just the way they are. So I just wanted to get to where somebody could see what was happening so to make sure—and because of an incident I had with them before where they drew down on me with my children in front of me.

Appellant alleged that on November 20, 2014, fifteen to twenty police officers stormed his backyard with guns drawn in front of his four and five year old children.

Appellant subsequently testified that when he backed into Deputy Taylor's patrol car, it was done accidentally. Following that testimony, at a bench conference, the State pointed out that Appellant had not admitted the culpable mental state as required for a necessity instruction. The State then elicited the following unambiguous testimony denying the culpable mental state:

> PROSECUTOR: Did you intentionally or knowingly threaten Clayton Taylor with imminent bodily injury by operating a motor vehicle into a motor vehicle occupied by Clayton Taylor?
>
> APPELLANT: No.
>
> PROSECUTOR: Did you use or exhibit a deadly weapon, a motor vehicle?
>
> APPELLANT: No.

14

Defense counsel attempted to elicit the required admission on redirect.

> DEFENSE COUNSEL: And at the intersection of Broadway and MLK, did you put that Yukon in reverse and ram into a car that was occupied by Clayton Taylor?
>
> APPELLANT: Yes, sir, I did.
>
> DEFENSE COUNSEL: You did that?
>
> APPELLANT: Yes, sir, I did.
>
> DEFENSE COUNSEL: All right. When he's talking about legal—did you intentionally, knowingly—those are legal terms, right?
>
> APPELLANT: Yes, sir.
>
> DEFENSE COUNSEL: You know that you put the car in reverse?
>
> APPELLANT: Yes, sir.
>
> DEFENSE COUNSEL: The Yukon you were in?
>
> APPELLANT: Yes, sir.
>
> DEFENSE COUNSEL: You rammed the car that Clayton Taylor was in?
>
> APPELLANT: Yes, sir.
>
> DEFENSE COUNSEL: And after you rammed it, you took off?
>
> APPELLANT: Yes, sir.
>
> DEFENSE COUNSEL: Now, you said you took off because you was [sic] in fear, and you rammed this car because of what happened in the incident at your house on November of 2014 where an officer came down and drew down guns on you and your girls in the backyard?
>
> APPELLANT: Yes, sir. That's why I took off.
>
> DEFENSE COUNSEL: And you were trying to get to some relative's house or somebody so they could witness whatever happened when you turned yourself in?
>
> APPELLANT: Yes, sir. And like I said, when I put it in reverse, my intention was—I thought I was in the street. But, I mean, there's no denying that I did hit him, you know, but it wasn't like I mashed the gas and kept it in reverse trying to run him off the road or anything. It wasn't like that. As soon as I felt contact with him, I shot off in the other direction.

The latter response by Appellant again makes clear that he admitted to intentionally putting his vehicle in reverse and backing up, but not to intentionally or knowingly threatening Deputy Taylor as required for a necessity instruction. However, defense counsel elicited an affirmative response to the question of whether he rammed the patrol car because of the prior

incident at his house. We recognize that a defendant may be entitled to a necessity instruction even when he denies the culpable mental state if the culpable mental state is admitted in, or may be reasonably inferred from, another part of his testimony. *See id.* at 405.

In *Juarez*, the defendant was on trial for biting a police officer who was taking him into custody. *See id.* at 400. The defendant testified that he did not intentionally, knowingly, or recklessly bite the officer's finger. *Id.* However, he also testified that the officer was causing him to feel like he was suffocating, and he bit the officer's finger to get the officer off of him. *Id.* The court of criminal appeals held that the defendant was entitled to a necessity instruction because the jury could have reasonably inferred the culpable mental state from his testimony about the circumstances surrounding his conduct. *See id.* at 405.

Here, the jury could not have made the same reasonable inference from Appellant's testimony. When defense counsel asked the compound question regarding whether Appellant fled from Deputy Taylor and rammed his patrol car because of the prior incident at his house, Appellant's answer of "Yes, sir. That's why I took off," is clearly a response only to the part of the question regarding initially fleeing from Taylor. Regarding the ramming of the patrol car, Appellant consistently and adamantly testified that he only backed up to get out of the cross street. We conclude that none of Appellant's testimony constitutes an admission to intentionally or knowingly threatening Deputy Taylor with his vehicle. Consequently, Appellant was not entitled to a necessity instruction. *See id.* at 399.

Furthermore, the undisputed facts in this case indicate a complete absence of immediate necessity or imminent harm as required for a necessity defense. *See* TEX. PENAL CODE ANN. § 9.22. Appellant correctly notes that a defendant's testimony alone may be sufficient to raise a necessity issue. *See Williams*, 630 S.W.2d at 643. Consequently, he argues that his testimony regarding his history with law enforcement is sufficient to raise the elements of immediate necessity and imminent harm. As previously discussed, Appellant testified that he fled from Deputy Taylor because he had been mistreated by law enforcement in the past and wanted to get to where someone could see what was happening. In further explanation of why he fled, Appellant testified, "Because I didn't believe him [about having a warrant for my arrest], and I kind of felt like it was just another ploy for them to either take a chance at shooting me and claim I had a weapon or something, because I know I didn't have a warrant." But even if Appellant's testimony shows a reasonable belief that his initial fleeing was immediately necessary to avoid

imminent harm, it does not show the same regarding threatening Taylor with his vehicle. To the contrary, Appellant said that he did not know how far behind him Taylor was, and he accidentally backed into his patrol car while trying to avoid potential cross traffic. Because Appellant's testimony does not raise a question of whether it was immediately necessary for him to threaten Taylor with his vehicle to avoid imminent harm, it is not sufficient to raise a necessity issue.

Nor does any other evidence in the record raise that question. The in-car video shows that Deputy Taylor was consistently calm and polite in his interactions with Appellant, and that there was nothing special about the circumstances at the particular time that Appellant decided to stop his vehicle and back into the patrol car. We find no evidence supporting a rational inference that Appellant was required to make a split-second decision to hit the car without time to consider the law. *See Pennington*, 54 S.W.3d at 857. Therefore, the evidence did not raise a question of immediate necessity and imminent harm as required for a necessity defense. *See id.*; TEX. PENAL CODE ANN. § 9.22. Because the evidence did not raise each element of the defense, we conclude that the trial court did not err by denying Appellant's request for a necessity instruction. *See Stefanoff*, 78 S.W.3d at 499. Accordingly, we overrule Appellant's third issue.

## Article 38.23 Instruction

Under Article 38.23 of the code of criminal procedure, "[n]o evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case." TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (West 2005). The article further provides that "[i]n any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained." *Id.*

In Appellant's fourth issue, he argues that he was entitled to a jury instruction under Article 38.23 because the evidence raised a fact issue regarding whether Deputy Taylor had probable cause to initiate the original traffic stop. We disagree.

Regardless of whether such a fact issue was raised, Appellant was not entitled to the requested instruction. "Obtained in violation of the law" under Article 38.23 contemplates that a crime has been committed, evidence of the crime exists, and officers violate the law in attempting to obtain evidence of the crime. *State v. Mayorga*, 901 S.W.2d 943, 945-46 (Tex. Crim. App.

17

1995).  Article 38.23 does not require the exclusion of evidence of a crime committed after an unlawful arrest or detention.  *See id.*; *Donoho v. State*, 39 S.W.3d 324, 327 (Tex. App.—Fort Worth 2001, pet. ref'd).  Here, because the assault occurred after the alleged unlawful detention, any evidence of it was not "obtained in violation of the law" and thus Article 38.23 is inapplicable.  *See Mayorga*, 901 S.W.2d at 945-46; *see also* TEX. CODE CRIM. PROC. ANN. art. 38.23(a).  Accordingly, we overrule Appellant's fourth issue.

## COURT COSTS

In his fifth issue, Appellant argues that this Court should modify the trial court's judgment and withdrawal order to remove unconstitutional portions of the consolidated court cost assessment.

### Applicable Law

The imposition of court costs upon a criminal defendant is a "nonpunitive recoupment of the costs of judicial resources expended in connection with the trial of the case."  *Johnson v. State*, 423 S.W.3d 385, 390 (Tex. Crim. App. 2014).  The consolidated fee statute requires a defendant to pay a court cost of $133 on conviction of a felony.  TEX. LOC. GOV'T CODE ANN. § 133.102(a)(1) (West Supp. 2017).  The money received is divided among a variety of state government accounts according to percentages dictated by the statute. *See id.* § 133.102(e) (West Supp. 2017); *Salinas v. State*, 523 S.W.3d 103, 105 (Tex. Crim. App. 2017).  The court of criminal appeals has held the statute unconstitutional with respect to two of these accounts: an account for "abused children's counseling" and an account for "comprehensive rehabilitation." *See Salinas*, 523 S.W.3d at 105.  As a result, the court held that any fee assessed pursuant to the statute must be reduced pro rata to eliminate the percentage of the fee associated with these accounts.  *Id.*  However, the court held that its holding applies only to (1) a defendant who raised the appropriate claim in a petition for discretionary review before the date of the court's opinion, if that petition is still pending on that date and the claim would otherwise be properly before the court on discretionary review, or (2) a defendant whose trial ends after the mandate in *Salinas* issues.  *Id.* at 113.

### Analysis

Here, the final judgment shows a court cost assessment of $229.  The bill of costs shows that the $133 consolidated fee was assessed.  However, because no petition for discretionary

review is pending on Appellant's claim, and the proceedings in the trial court ended on June 29, 2016—well before the court of criminal appeals's decision in *Salinas*—the court's holding in that case does not apply. *See id.*

Despite the court of criminal appeals's holding on retroactivity, Appellant argues that we should grant relief based on his due process rights. We decline to do so. In *Salinas*, the court held that portions of the consolidated fee statute are unconstitutional under the Separation of Powers provision of the Texas Constitution. *See id.* at 109-10. The court explained that the separation of powers violation is a violation of a right of the courts, not of any personal right of the defendant. *See id.* at 112. The court further concluded that when a new state constitutional rule does not involve a personal right of the defendant, a balancing analysis under *Stovall v. Denno*[4] is appropriate to determine the applicable retroactivity rule. *See id.* The court then conducted a *Stovall* analysis and determined that the rule described above should apply. *See id.* at 112-13.

We are required to comply with the instructions set out in the opinions of the court of criminal appeals because they are binding authority on this Court. *See Purchase v. State*, 84 S.W.3d 696, 701 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd); *see also* TEX. CONST. art. V, § 5(a) (court of criminal appeals is final authority for criminal law in Texas). Moreover, this Court has previously rejected a contention virtually identical to that made by Appellant in this appeal. *See Waters v. State*, No. 12-17-00202-CR, 2018 WL 524870 (Tex. App.—Tyler Jan. 24, 2018, no pet. h.) (mem. op., not designated for publication). Accordingly, we overrule Appellant's fifth issue.

## DISPOSITION

Having overruled Appellant's first, second, third, fourth, and fifth issues, we ***affirm*** the trial court's judgment.

BRIAN HOYLE
Justice

Opinion delivered March 7, 2018.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(DO NOT PUBLISH)

---

[4] 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967).



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**MARCH 7, 2018**

**NO. 12-16-00225-CR**

**GREGORY DEWAYNE TENNYSON,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 241st District Court
of Smith County, Texas (Tr.Ct.No. 241-0030-16)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*